### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| **JENNIFER ANTLE,** § | |
| Plaintiff, § | |
| § | |
| v. § | No. 3:10-CV-02136-BF |
| § | |
| **COMMISSIONER OF THE** § | |
| **SOCIAL SECURITY ADMINISTRATION,** § | |
| Defendant. § | |

### MEMORANDUM OPINION AND ORDER

This is an appeal from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying the claim of Jennifer Antle ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act") and Supplemental Security Income ("SSI") under Title XVI of the Act. The Court considered Plaintiff's Brief, filed on July 18, 2011, Defendant's Brief, filed on August 17, 2011, and Plaintiff's Reply Brief, filed on September 30, 2011. The Court reviewed the record in connection with the pleadings. For the following reasons, the final decision of the Commissioner is **AFFIRMED**.

### Background[1]

**Procedural History**

Plaintiff filed applications for Titles II and XVI benefits on October 1, 2007, alleging a disability onset date of January 1, 2005 due to bipolar disorder. (Tr. 100-109, 110-112, 151.) These applications were initially denied by the Commissioner, and again upon reconsideration. (Tr. 56-61, 67-70.) Plaintiff requested a hearing, which was held on July 21, 2008 in front of an Administrative Law Judge ("ALJ"). (Tr. 23-49.) At the hearing, Plaintiff and a Vocational Expert ("VE") testified.

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

(*Id*.)  The ALJ issued an unfavorable decision on December 11, 2008, denying both of Plaintiff's applications.  (Tr. 8-22.)  Plaintiff filed a timely request with the Appeals Council to review the ALJ's decision. (Tr. 7.)  The Appeals Council declined Plaintiff's request for review on August 27, 2010.  (Tr. 1-5).  Thus, the ALJ's decision became the final decision of the Commissioner, from which Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

**Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on October 30, 1983.  (Tr. 102, 110.)  She was 22 years old on her alleged onset date and 24 years old at the time of the hearing.  (*Id.*)  Plaintiff has a tenth grade education and she has never obtained a GED.  (Tr. 26.)  Plaintiff had to repeat first grade due to difficulty with reading, and she also was in special education classes.  (Tr. 219.)

Plaintiff has had a number of short-term, low-paying jobs.  (Tr. 117-118.)  She reported being a cashier at McDonald's for approximately six months and she worked at multiple Subway restaurants for unspecified periods of time.  (Tr. 196.)  At the time she applied for benefits, she reported working 20-27 hours per week and earning $6.00 per hour.  (Tr. 103.)  In his findings, the ALJ found that Plaintiff's earnings were never high enough to meet the standard of substantial gainful activity.  (Tr. 21.)

**Plaintiff's Medical Evidence**

Plaintiff submitted treatment records from the Lakes Regional Mental Health and Mental Retardation Center ("MHMR").  (Tr. 241-268, 301-327.)  Plaintiff's first visit to MHMR was on September 26, 2007.  (Tr. 254.)  A "Brief Bipolar Disorder Symptom Scale" was completed by the doctor.  (*Id.*)  Plaintiff exhibited the following symptoms: mild hostility, motor hyperactivity, depressed mood, and emotional withdrawal; moderate elevated mood; very mild grandiosity, blunted

affect, and unusual thought content; and moderately severe excitement and anxiety. (*Id.*) Plaintiff was diagnosed with bipolar disorder, without psychotic features, and panic disorder, without agoraphobia. (Tr. 256.) She was assigned a Global Assessment of Functioning ("GAF") score of 41.[2] (*Id.*) Plaintiff was not prescribed any medications.

On January 16, 2008, a psychiatric evaluation was performed. (Tr. 242-53.) The doctor noted a history of depression in Plaintiff's family, and that Plaintiff had never been seen by a mental health professional outside of MHMR. (Tr. 242.) Plaintiff exhibited a blunted range of emotions; appropriate facial expressions, dress, speech, interview behavior, and affect; poor recent memory and an inability to concentrate; good insight and judgment; oriented to time, place, person and situation; no delusions; and normal intellect. (Tr. 244-45.) The doctor also noted the following symptoms: "sad, amotivation, anhedonia, increased irritability, increased anger, verbally explosive, mood lability, and has had times of mania/hypomania." (Tr. 242.) The doctor completed another "Brief Bipolar Disorder Symptom Scale". (Tr. 264.) The results were similar to the earlier scale except Plaintiff's hostility and depressed mood increased from mild to moderately severe, and her emotional withdrawal increased from mild to moderate. (*See* Tr. 254, 264.) She was prescribed a course of valporic acid and Titrate, Buproprion, Tradozone, and Vistaril. (Tr. 248-250.) Her diagnoses and GAF score remained the same. (Tr. 251-52.)

On April 10, 2008, Plaintiff presented with complaints that her medications were not working, she was not sleeping well, and she rated her depression and anxiety as an 8. (Tr. 319.) The clinician noted that Plaintiff did not make a follow-up appointment after her psychiatric evaluation in January,

---

[2] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM). A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning. *See id.*

and thus she needed to make an appointment with the doctor. (*Id.*) On June 11, 2008, Plaintiff met with the doctor and her medications were adjusted. (Tr. 305-17.) She was prescribed Bupropion SR, Carbamazepine, Temazepam, and Clonazepam. (Tr. 306-09.) Plaintiff was taken off Vistaril, Valproic Acid, and Trazodone. (*Id.*) The doctor noted that Plaintiff had no suicidal or homicidal thoughts, and all her symptoms were rated at a 5 or less on a scale of 0-10, with 0 being no symptoms, 5 being moderate symptoms, and 10 being extreme symptoms. (Tr. 306.) Nonetheless, another "Brief Bipolar Disorder Symptom Scale" was completed and some of Plaintiff's symptoms had worsened. Her elevated mood and emotional withdrawal increased from moderate to moderately severe; her motor hyperactivity increased from mild to moderate; and her depressed mood increased from moderately severe to severe. (*See* Tr. 254, 264, 313.) Plaintiff's diagnoses and GAF score remained the same. (Tr. 310-11.)

On July 2, 2008, Plaintiff presented to MHMR with no complaints. (Tr. 303.) The clinician noted that Plaintiff was doing very well with her current medications, she was smiling, she rated her depression as a 2, and she reported stable moods. (*Id.*) This is the last treatment record from MHMR.

On December 7, 2007, Plaintiff underwent a psychological consultative examination with Linda Ludden, Ed.D. (Tr. 218-222.) Plaintiff reported that she had just started receiving treatment from MHMR, but had not been prescribed any medications yet. (Tr. 218.) Ms. Ludden found that Plaintiff's information was reliable. (*Id.*) Regarding her daily living activities, Plaintiff reported she is capable of caring for herself; she can complete chores; she has no problems traveling to new places, but she does not go alone and she does not have a driver's license; she shops for groceries and prepares her own meals; and she can handle her own finances. (Tr. 219.) Regarding her social

4

functioning, Plaintiff reported having no friends, not getting along with family members, and getting along with authority figures until she has trouble with her employers. (*Id.*) Regarding her ability to complete tasks, Plaintiff stated that she does not usually complete tasks timely or appropriately because she is easily distracted, has poor motivation, and difficulty concentrating. (*Id.*) Ms. Ludden noted that Plaintiff's thought process was logical, her mood was depressed, her remote memory and judgment were satisfactory, and her insight was partial. (Tr. 220.) Plaintiff denied delusional thoughts, suicidal or homicidal thoughts, and obsessive/compulsive thoughts. (*Id.*) She did report excessive anxiousness and possible hallucinations. (*Id.*) Ms. Ludden diagnosed Plaintiff with bipolar disorder and anxiety disorder, and assigned her a GAF score of 45. (Tr. 221.)

At the request of the Commissioner, a state agency psychologist, Dr. Don Marler, completed a Psychiatric Review Technique and a Mental Residual Functional Capacity ("RFC") Assessment on December 20, 2007. In the psychiatric review technique, Dr. Marler found Plaintiff to have 12.04 Affective Disorders (bipolar disorder) and 12.06 Anxiety-Related Disorders (anxiety disorder). (Tr. 223-28.) Regarding Plaintiff's functional limitations, he found her to have mild restrictions of activities of daily living and difficulties in maintaining concentration, persistence, and pace; moderate difficulties in maintaining social functioning; and no episodes of decompensation. (Tr. 233.) He noted that a GAF score of 45 was inconsistent with clinical findings. (Tr. 235.) He also made a notation that she presented to the exam alone, despite her stating that she does not travel to new and unfamiliar locations alone. He described Plaintiff as not credible in that regard. (*Id.*)

For the mental RFC assessment, he opined Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions; she was moderately limited in her ability to work in proximity to others without being distracted by them, her ability to complete a normal

5

workday and workweek without interruptions from psychologically based symptoms, her ability to interact appropriately with the general public, her ability to accept instructions and respond appropriately to criticism from supervisors, her ability to get along with co-workers without distracting them, and her ability to respond appropriately to changes in the work setting; and she was not significantly limited in all other categories, which mainly consisted of her ability to understand, remember, and carry out simple tasks or instructions, her ability to ask simple questions, and her ability to make simple decisions. (Tr. 237-38.)

After Plaintiff's hearing, the ALJ sent her to a psychologist, Dr. Ronald Anderson, for another psychological consultative examination. (Tr. 329-338.) On September 21, 2008, Dr. Anderson administered the Weschler Adult Intelligence Scale-III ("WAIS-III"), the Wide Range Achievement Test-Revision 3 ("WRAT-3"), and the Minnesota Multiphasic Personality Inventory-II ("MMPI"). (Tr. 331-332.) Plaintiff's WAIS-III results indicated her Verbal, Performance, and Full-Scale IQ scores were 80, 72, and 74, respectively. (Tr. 331.) Her WRAT-3 results indicated that she read at a fifth grade level, spelled at a fourth grade level, and performed arithmetic at a second grade level, placing her in the fifth, third, and eighth percentiles, respectively. (*Id.*) Dr. Anderson noted that the findings of the WAIS-III examination indicated an intellectual functioning in the borderline range of intelligence. (*Id.*) He described her general learning ability as below average. (*Id.*) Dr. Anderson made notations that Plaintiff continued to sigh throughout the examination, she appeared unmotivated, everything she was asked to do was a big effort for her, and she needed pushing to put forth her best effort. (Tr. 329.) He noted that Plaintiff could have put forth more effort on the WAIS-III examination, but even if she did, she still would have fallen in the borderline range of intelligence. (Tr. 331.)

Regarding the results of the WRAT-3 exam, Dr. Anderson opined that her reading and spelling skills were in the inferior range, but consistent with her level of intellectual functioning. (Tr. 332.) He noted that she should be able to read and follow simple, written instructions, and she might be able to keep simple records. (*Id.*) Plaintiff's arithmetic skills were very poor and in the defective range. (*Id.*) Dr. Anderson wrote that he "felt the findings of the WAIS and WRAT are a minimal assessment of [Plaintiff's] actual abilities. The findings of the MMPI also appear very questionable and to be possibly invalid." (Tr. 330.)

Dr. Anderson also completed a Medical Source Statement demonstrating Plaintiff's mental ability to do work-related activities. (Tr. 336-38.) He noted mild limitations in her ability to understand and remember simple instructions; her ability to carry out simple instructions; her ability to make judgments on simple work-related decisions; her ability to interact appropriately with co-workers; and her ability to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 336-37.) He noted moderate limitations in her ability to interact appropriately with supervisors. (Tr. 337.) Finally, he noted marked limitations in her ability to understand and remember complex instructions; her ability to carry out complex instructions; her ability to make judgments on complex work-related decisions; and her ability to interact appropriately with the public. (Tr. 336-37.) Dr. Anderson diagnosed Plaintiff with bipolar disorder, anxiety disorder, mathematics disorder, and borderline intellectual functioning. (Tr. 334.) He assigned Plaintiff a GAF score of 50-55.[3] (*Id.*)

**Plaintiff's Testimony at the Hearing**

---

[3] A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM). A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See id.*

Plaintiff testified on her own behalf at the hearing held on July 31, 2008. (Tr. 23-49.) She stated that she is unable to hold down a steady job because of her anxiety and social stress. (Tr. 31.) She testified that her only job that lasted more than three months was at McDonald's. (*Id.*) She indicated that she has a two-year-old son and she is able to take care of him by washing, bathing, dressing, and feeding him. (Tr. 32.) She testified that she cooks for her son and for herself. (*Id.*) She said that she doesn't visit with family or friends, and she doesn't attend church or any other organizations. (Tr. 33.) She testified that she goes to the grocery store sometimes and she watches television every day, and is able to understand the shows and follow the stories. (Tr. 33-34.) She stated that she has trouble getting along with co-workers and other people in general. (Tr. 35-36.) She testified that there are times when she doesn't take care of herself, such as not bathing or showering. (Tr. 38.) She stated that she has trouble sleeping sometimes, and then other times all she does is sleep. (Tr. 38-39.) She testified that she has trouble concentrating, she experiences racing thoughts, she has trouble finishing things, and she is depressed and anxious. (Tr. 38-42.) She stated that her medications aren't working. (Tr. 43.)

**The Hearing**

A VE, Mr. Jerold Hildre, also testified at the hearing regarding jobs in the national economy. He stated that Plaintiff has no past work experience that qualifies as substantial gainful activity. (Tr. 44.) The ALJ posed a hypothetical to the VE: assume someone who must avoid jobs that require making decisions, having to use their judgment, or problem solving, but would have the ability to understand, carry out, and remember short and simple tasks and instructions, and would require work that involves minimal coworker interaction. (Tr. 44-45.) He then asked the VE if that hypothetical person, with the same age, education, and experience as Plaintiff,

would be able to perform any jobs in the national economy. (Tr. 45.) The VE identified the following representative occupations: "cleaner," DOT[4] #323.687-014; "kitchen helper," DOT #318.687-010; and "order-picker," DOT #922.687-058. (*Id.*) The VE also testified that a person would not be able to do competitive work if she could not complete a normal workday or workweek without constant interruptions from psychologically-based symptoms or without exhibiting behavioral extremes. (*Id.*) The ALJ then asked the VE if his testimony conflicted with the DOT, and the VE replied "no". (*Id.*) Upon cross-examination by Plaintiff's counsel, the VE added that a person who missed two or more days of work per month or was disrupted by psychologically based symptoms for an hour or two a day would also be unable to work. (Tr. 47.)

**The Decision**

The ALJ analyzed Plaintiff's claim pursuant to the familiar five-step sequential evaluation process.[5] At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 1, 2005. (Tr. 13.) At step two, the ALJ found that the medical evidence established that Plaintiff had the following severe impairments: bipolar disorder, borderline intellectual functioning, and an anxiety disorder. (*Id.*) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or

---

[4]The Dictionary of Occupational Titles ("DOT") is a standardized volume of job definitions that the Social Security Administration relies on at steps 4 and 5 of its five-step disability determination process. SSR 00-4p, 2000 WL 1898704 at *2.

[5](1) Is the claimant currently working? (2) Does she have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent her from performing her past relevant work? (5) Does the impairment prevent her from doing any other work? 20 C.F.R. §§ 404.1520, 416.920.

medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17.)

Before proceeding to step four, the ALJ assessed Plaintiff's RFC. He determined that she could perform a full range of work at all exertional levels, but she must avoid jobs that require making decisions or problem solving at a greater than simple level. (Tr. 18.) Further, Plaintiff is restricted to understanding, carrying out, and remembering simple one- to two-step tasks and instructions, and she requires work that involves minimal coworker interaction or having to use her judgment for more than simple decisions. (*Id.*)

At step four, the ALJ determined that Plaintiff did not have any past relevant work. (Tr. 21.) At step five, the ALJ found, based on the testimony of the VE, that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (*Id.*) These jobs included a cleaner, with at least 260,000 jobs in the national economy; kitchen helper, with at least 236,000 jobs in the national economy; and an order taker or picker, with at least 72,000 jobs in the national economy. (*Id.*) Hence, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act for the relevant time period.[6] (Tr. 22.)

## Standard of Review

To be entitled to social security benefits, a plaintiff must prove that she is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically

---

[6] The relevant time period is Plaintiff's alleged onset date, January 1, 2005, through the date of the decision, December 11, 2008.

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

### Issue

Whether the VE's testimony, upon which the ALJ relied, is in direct conflict with the Dictionary of Occupational Titles, thus rendering the ALJ's decision unsupported by substantial evidence.

### Analysis

When, as here, a decision is reached at Step 5, it means that the claimant established a *prima facie* case of disability, and the burden then shifted to the Commissioner to show that other work exists in the national economy that the claimant can perform despite his or her impairments. *Greenspan*, 38 F.3d at 236. In determining whether a claimant can perform alternative, available work, the Commissioner may consult VE's and/or the Dictionary of Occupational Titles (DOT). VE's assess whether jobs exist for a person with the claimant's precise abilities. *See e.g., Gilliam v. Califano*, 620 F.2d 691, 694 n.1 (8th Cir. 1980). They also assist in determining complex issues, such as whether a claimant's work skills can be used in other work and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). In some cases, courts require

that the Commissioner obtain expert vocational testimony or other similar evidence. *See Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985). The Regulations clearly permit ALJ's to rely on either the DOT or VE testimony when making the Step 5 determination. *See* 20 C.F.R. § 404.1566(d)-(e). Therefore, in some cases, a VE's opinion may conflict with the DOT's explanation of the requirements for particular jobs.

Under the Social Security Rulings, occupational evidence provided by a VE generally should be consistent with the occupational information supplied by the DOT. SSR 00-4p, 2000 SSR LEXIS 8, at *4 (December 4, 2000). As part of the ALJ's duty to fully develop the record of a hearing, the ALJ "will inquire, on the record, as to whether or not there is such consistency." *Id*. at *5. When there is an apparent unresolved conflict between VE evidence and the DOT, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE evidence to support a determination of disability. *Id*. Neither the DOT nor the VE evidence automatically "trumps" the other when there is a conflict. *Id*. A conflict must be resolved by determining whether the explanation given by the VE is reasonable and provides a basis for relying on the VE testimony rather than on the DOT information. *Id*. The ALJ must explain in the determination or decision how any conflict that has been identified was resolved. *Id*. at *1.

In the Fifth Circuit, an ALJ may, in appropriate cases, give greater weight to expert vocational testimony than to findings in the DOT. *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir.2000). When a "direct and obvious conflict" exists between the VE's testimony and the DOT and the ALJ fails to explain or resolve the conflict, the testimony is "so lessened that reversal and remand for lack of substantial evidence usually follows." *Carey*, 230 F.3d at 146; *see also Gaspard v. Soc. Sec. Admin., Comm'r*, 609 F. Supp. 2d 607, 613 (E.D. Tex. 2009). However, when the conflict is implied or

indirect, and it did not undergo adversarial cross-examination at the hearing, the VE's testimony may be relied upon by the ALJ without resolving the later-proposed conflict so long as the record reflects an adequate basis for doing so.  *Gaspard*, 609 F. Supp.2d at 613 (citing *Carey*, 230 F.3d at 146).

A direct conflict may arise when the VE's testimony regarding the exertional or skill level of a particular job is facially different than that indicated in the DOT, or when the VE's testimony creates a conflict between the ALJ's RFC determination and the description of the jobs in the DOT. *Carey*, 230 F.3d at 145.  Conversely, all kinds of implied conflicts and exceptions occur under various unique circumstances when VE's are called on to testify in regard to individual claimants' capabilities.  *Id*. at 146-47.  Since the DOT cannot satisfactorily address every such situation, claimants are not permitted to scan the record for implied or unexplained conflicts and then present the conflict as reversible error.  *Id.*

Here, Plaintiff alleges there is a direct conflict between the VE's testimony and the DOT's job descriptions for the occupations that the VE identified.  (Pl.'s Br. at 11.)  Plaintiff essentially argues that her aptitude level disqualifies her from all three of the jobs specified by the VE based on the aptitude levels for those jobs set forth in the DOT.  (*Id.* at 13.)  Specifically, she states that all of the occupations require a General Learning Ability, one of the eleven aptitudes, of 4, which signifies the "lowest 1/3 [of the population] excluding bottom 10%".  (*Id.; see* DICOT 323.687-014, 1991 WL 672783; DICOT 318.687-0101, 1991 WL 672752; DICOT 922.687-058, 1991 WL 688132.) Plaintiff asserts that her IQ scores of 80, 72, and 74, respectively, on the Verbal, Performance, and Full-Scale portions of the WAIS-III exam places her aptitude level in the lowest ten-percent of the population.[7]

---

[7] In support of her argument, Plaintiff attached to her brief an "IQ Percentile and Rarity Chart" from the IQ Comparison Site, available at http://www.iqcomparisonsite.com/IQtable.aspx.  (Pl.'s Br., Appendix A.)  From the chart, it

14

According to the DOT, the jobs for which she was found qualified require an aptitude level above the lowest ten-percent of the population, rendering her incapable of performing these jobs. Nevertheless, Plaintiff fails to cite or show this Court the DOT provision that provides that an individual's IQ score is indicative of their aptitude level for the General Learning Ability aptitude.

Instead, to construct this conflict, Plaintiff cites to another publication of the Department of Labor, the 1991 Revised Handbook for Analyzing Jobs ("RHAJ"). (*See* Pl.'s Reply Br., Ex. B.) In the RHAJ, there is a chapter on Aptitudes which describes all eleven of the aptitudes and provides their respective definitions and examples. (*See id.*) The General Learning Ability is defined as "[t]he ability to 'catch on' or understand instructions and underlying principles; the ability to reason and make judgments. Closely related to doing well in school." U.S. Dep't of Labor, Revised Handbook for Analyzing Jobs 9-3 (1991). Plaintiff assumes that the levels of aptitude under this definition are necessarily decided based upon an individual's IQ score. (*See* Pl.'s Reply Br. at 1-3.) However, the section in the RHAJ that Plaintiff has provided makes no mention of utilizing an individual's IQ score to determine their level of aptitude, and this Court will make no such assumption. Assuming *arguendo,* the RHAJ did present such conflict as Plaintiff presumes, the Court in *Gaspard* addressed this precise issue:

> But in absence of proof that the Commissioner takes administrative notice of RHAJ information, or otherwise embraces it as authoritative, the court cannot connect the dots in such a way as to conclude that a RHAJ-based conflict runs afoul of either circuit law or Soc. Sec. R. 00-4p which require certain actions when a conflict exists with the DOT.

---

appears that Plaintiff's IQ scores would place her within the bottom ten percentiles. (*See id.*)

*Gaspard,* 609 F. Supp. 2d at 616; *see Burns v. Barnhart*, 312 F.3d 113, 128 n. 9 (3rd Cir.2002) ("While aptitudes are discussed in various occupational handbooks. . . aptitude levels are not in the DOT or any other source of which the Social Security Administration has taken administrative notice. Therefore, the DOT and testimony of the vocational expert was not necessarily inconsistent in this regard, so the duty on the part of the ALJ to inquire into conflicts did not arise.")

At best, the conflict which Plaintiff alleges to exist, would be implied or indirect. Thus, the VE's testimony could be relied upon by the ALJ so long as it did not undergo adversarial cross-examination and the record reflects an adequate basis for doing so. *See Carey,* 230 F.3d at 146; *Gaspard,* 609 F. Supp. 2d at 613. At the hearing, the ALJ inquired with the VE as to whether his testimony conflicted with the DOT. The VE responded that there was no conflict, and none was otherwise suggested during cross-examination by Plaintiff's counsel. Thus, the ALJ complied with his duty under Social Security Ruling 00-4p. The Court will now turn to the record.

Dr. Anderson performed a consultative psychological examination on September 21, 2008. In his notes, he indicated that Plaintiff had a borderline range of intelligence and he described her general learning ability as below average. He opined that Plaintiff could read and write simple, written instructions, and she might even be able to keep simple records. In his medical source statement, he noted that Plaintiff only had mild limitations in her ability to understand, remember, and carry out simple instructions; her ability to make judgments on simple work-related decisions; and her ability to interact appropriately with co-workers.

Dr. Marler, a state agency physician, completed a psychiatric review technique and a mental RFC assessment on December 20, 2007. He found Plaintiff to have mild restrictions on activities of daily living and mild difficulties in maintaining concentration, persistence, and pace. He noted

Plaintiff was not significantly limited in her ability to understand, remember, and carry-out simple tasks or instructions; her ability to ask simple questions; and her ability to make simple decisions.

A person's RFC is her ability to perform physical and mental work activities on a regular and continuing basis notwithstanding limitations from her impairments. 20 CFR §404.1545. The ALJ is responsible for determining a claimant's RFC if the claimant is at the ALJ hearing level. 20 CFR §404.1546(c). In assessing the claimant's RFC, the ALJ will consider all medical evidence as well as other evidence provided by the claimant. 20 CFR §404.1545(a)(3).

Here, the ALJ determined Plaintiff's RFC after consideration of all the evidence in the record and found she could perform a full range of work at all exertional levels, but she must avoid jobs that require making decisions or problem solving at a greater than simple level. Further, he restricted Plaintiff to understanding, carrying out, and remembering simple one- to two-step tasks and instructions, and only minimal coworker interaction or having to use her judgment for more than simple decisions. The ALJ's RFC is clearly supported by the medical evidence of record and was accurately reflected in the ALJ's hypothetical to the VE.[8] Additionally, the Court points out that Dr. Anderson specifically addressed Plaintiff's general learning ability and stated that it was below average. The Court finds that below average would be consistent with an aptitude level of 4 (lowest 1/3 of the population excluding bottom 10%) rather than an aptitude level of 5 (bottom 10% of the

---

[8] In Plaintiff's reply brief, she makes another argument that the ALJ's RFC determination does not include all of Plaintiff's limitations, and thus, his hypothetical to the VE was improper. (Pl. Reply Br. at 4-6.) However, the ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir.1988). The Court finds that the ALJ did include all of Plaintiff's supported limitations in his RFC assessment. Therefore, his hypothetical to the VE was proper and elicited a proper response upon which he could rely.

population), where Plaintiff suggests she falls. *See* U.S. Dep't of Labor, Revised Handbook for Analyzing Jobs 9-2 (1991). Thus, the Court finds that the record reflects an adequate basis for relying on the VE's testimony.

In sum, the Court finds that there was no direct conflict between the VE's testimony and the provisions of the DOT. Furthermore, the Court finds that even if there was an indirect conflict with the VE's testimony and the DOT, through the use of the RHAJ, the ALJ properly relied on the VE's testimony because the conflict wasn't presented upon cross-examination and the record reflected an adequate basis for doing so. *See Carey,* 230 F.3d at 146; *Gaspard,* 609 F. Supp. 2d at 613.

## Conclusion

For the foregoing reasons, the final decision of the Commissioner is **AFFIRMED** and Plaintiff's Complaint is dismissed with prejudice.

SO ORDERED, March 13, 2012.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE